**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| PROVIDENT PRECIOUS METALS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:13-CV-02942-M |
| | § | |
| NORTHWEST TERRITORIAL MINT, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's Motion for Summary Judgment [Dkt. No. 72]. For the reasons stated below, the Motion is **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Provident Precious Metals, LLC ("Provident") brings this declaratory action against one of its competitors, Defendant Northwest Territorial Mint, LLC ("NWTM"), seeking a declaratory judgment of invalidity and non-infringement of NWTM's alleged copyrights, trademarks, and trade dress rights. Provident and NWTM manufacture precious metals in the shape of famous types of ammunition ("replica bullets"). The following facts detail the process and timeline by which NWTM and Provident conceived, manufactured, and marketed their respective replica bullets. Unless otherwise stated, these facts are undisputed.

## I.     NWTM Designs and Manufactures Replica Bullets

Both Provident and NWTM are Texas limited liability companies that make and sell novelty and commemorative items, like coins, medals, and replica bullets.[1]  In 2008, NWTM first conceived of the idea of using silver bullion to copy famous ammunition into sizes that would easily convert to weights in even troy ounces.[2]  Ross Hansen, who owns and controls NWTM, estimated that a .45 Automatic Colt Pistol (ACP) replica bullet made of silver would weigh approximately one troy ounce.[3]

To make the replica bullets, NWTM measured sample ammunition with a digital caliper and micrometer, viewed pictures of sample bullets on the Internet, and referenced the Sporting Arms and Ammunition Manufacturers' Institute's (SAAMI's) published industry standards for ammunition dimensions.[4]  NWTM also acquired hundreds of different ammunition rounds, focusing on popular shapes and sizes, and sought to replicate bullets at volumes that approximated even weights, which ultimately led it to first replicate the .45 ACP round.[5]  NWTM altered the dimensions of the original to match the desired bullion weight, but still sought to appeal to a "gun person, or anyone buying bullion."[6]  Although NWTM began by using a "trial and error" system to get the proper weight and dimensions, it ultimately resorted to computer software to make a computer-aided design ("CAD") of the particular bullet, before

---

[1] Dkt. No. 1 ¶ 9 (Pl.'s Complaint for Declaratory Judgment); Pl. Ex. E, Pl. App. 192 (Def.'s Resp. to Pl.'s RFA No. 12); Dkt. No. 10 ¶¶ 4, 10-11 (Def.'s Answer); Pl. Ex. B, Pl. App. 116, 123 (Ross Hansen Dep. at 19:17-23, 32:9-12); Dkt. No. 19 ¶¶ 10-11 (Def.'s Amended Answer).
[2] Pl. Ex. B, Pl. App. 138-41, 144-46 (Hansen Dep. at 135-38, 148-50).
[3] Pl. Ex. E, Pl. App. 192 (Def.'s Resp. to Pl.'s RFA No. 12); Pl. Ex. A, Pl. App. 6-7 (Michael Shaudis Dep. at 23:2-24:17).
[4] Pl. Ex. B, Pl. App. 121-22 (Hansen Dep. at 30:8-31:9); Pl. Ex. A-2, Pl. App. 36-39 (Daniel Neumann Dep. at 18-21); Pl. Ex. A-1, Pl. App. 11 (Shaudis Dep. at 32:3-21).
[5] Pl. Ex. B, Pl. App. 138-39 (Hansen Dep. at 135:13-136:14).
[6] Pl. Ex. A-2, Pl. App. 36-37, 43 (Neumann Dep. at 18:24-19:22, 27:15-24).

converting the design into code and uploading it to NWTM's manufacturing machines.[7]

According to NWTM's designer, Michael Shaudis, once the bullet was "machined," it would be weighed, and if it "weigh[ed] right they wouldn't adjust it to meet [the particular dimension]."[8]  In other words, "[i]f the weight [was] right and everything look[ed] right they would ignore the number and go off the weight."[9]  According to NWTM, "the weight dictated the form," although it was "going for looks" as well.[10]

NWTM stamped the base of each bullet with a "head stamp" containing certain information, including the product's metal designation (silver, or "Ag"), source (NWTM), weight, and purity.[11]  The format of the head stamp intentionally resembled the format of head stamps on actual ammunition, and was intended to convey that the replica bullet "has intrinsical [sic] value," similar to money.[12]  To make the head stamp, NWTM used a die to imprint a circle, similar to the primer of an actual bullet, and used Tahoma font to inscribe the substance, source, weight, and purity on the head stamp.[13]

NWTM's replica bullets are placed in boxes or plastic bags designed to "evoke the feeling of military surplus ammunition," and to "best present the product to a military customer, to evoke the military design."[14]  The NWTM boxes have labels on both the outside and inside of

---

[7] Pl. Ex. A-2, Pl. App. 40-41, 47-48 (Neumann Dep. at 22:11-23:25, 37-38).

[8] Pl. Ex. A-1, Pl. App. 59 (Shaudis Dep. at 61:7-11).

[9] *Id.*

[10] Pl. Ex. B, Pl. App. 125 (Hansen Dep. at 50:14-21).

[11] Pl. Ex. A-1, Pl. App. 12-13, 24, 26 (Shaudis Dep. at 33:16-34:22, 66:5-21, 68:10-16); Pl. Ex. A-2, Pl. App. 53 (Neumann Dep. at 50:9-19); Pl. Ex. B., Pl. App. 130-31 (Hansen Dep. at 69:12-70:24).

[12] Pl. Ex. A-1, Pl. App. 28 (Shaudis Dep. at 70:8-23); Pl. Ex. A-2, Pl. App. 52 (Neumann Dep. at 48:8-24).

[13] Pl. Ex. A-2, Pl. App. 61-62 (Neumann Dep. at 69:20-70:14).

[14] Pl. Ex. A-1, Pl. App. 13 (Shaudis Dep. at 34:4-22); Pl. Ex. P-11, Pl. App. 522 (Side-by-Side of NWTM and Provident Cartridge Packaging).

the cover or lid, with the inside label being visible only after a box is opened.[15]  The outside label identifies "NWTM" and lists the number of cartridges, the type of ammunition, grain count, weight, substance, and date of inspection.[16]

NWTM first offered silver replica bullets for sale in January 2013, and introduced copper replica bullets two months later.[17]  NWTM advertised its replica bullets as being virtually identical to their ammunition counterparts.  For example, NWTM stated to prospective customers that it "faithfully duplicates the famed .50 BM so well-known to military personnel and weapon enthusiasts," that its silver 7.62 NATO (.308) is a "near exact, non-firing replica of the round developed in the 1950s as the small arms standard for NATO countries," that its solid silver bullets are "nearly identical to a real .45 cartridge [which] celebrates the cartridges designed by John Browning in 1904 for use in his Colt semi-automatic .45 pistol," and that its 25 troy ounce 20 MM Cannon shell replica is a "solid silver replica of the shell used in cannons."[18]

Provident claims NWTM's advertising is significant because NWTM has repeatedly asserted in the course of this litigation that its bullets are not replicas, but rather are "sculptures" that only *resemble* real ammunition.[19]  Provident claims that a visual comparison and dimensional measurements show that there is virtually no variation between both parties' replica

---

[15] Pl. Ex. 11, Pl. App. 522.
[16] *Id.*
[17] Dkt. No. 46-1 ¶¶ 9-10, 15-16 (Def.'s Proposed Second Amended Answer and Counterclaims).
[18] Pl. Ex. C, Pl. App. 164-69 (NWTM Marketing Materials); *see also* Pl. Ex. M, Pl. App. 456-66 (Screenshots from NWTM's Website).
[19] Pl. Ex. B, Pl. App. 133-35 (Hansen Dep. at 85:19-87:24) (describing the resemblance between NWTM's replica bullets and actual ammunition as "vague" and like "apples and oranges"); Pl. Ex. A-1, Pl. App. 18 (Shaudis Dep. at 49:8-15) (describing dimensions of NWTM's replica bullets as "vastly" and "quite substantially" different from the dimensions of actual ammunition).

bullets and their real ammunition counterparts.[20]

## II.    Provident Designs and Manufactures Replica Bullets

Provident claims to have conceived of the idea of making replica bullets and to have developed its manufacturing process independently of NWTM, and that no one at Provident or its affiliated manufacturer, NTR Metals ("NTR"), copied any replica bullets or any other material or process belonging to NWTM.[21]

In early 2013, Provident instructed NTR to get live ammunition and replicate it in copper.[22]  NTR machinist Chanphang Phanid followed steps similar to those used by NWTM designer Shaudis.[23]  Whether NTR used knowledge of NWTM's process to make Provident's replica bullets is the subject of dispute between NWTM and Provident.  As did NWTM, NTR made minor adjustments in its CAD program to obtain the desired weight for Provident's replica bullets.[24]

---

[20] *See* Pl. Ex. P, Pl. App. 483-524 (showing dimensions and diagrams of products and actual ammunition); Pl. Ex. I, Pl. App. 219-26 (dimensional drawings); Pl. Ex. 6-A, Pl. App. 547-611 (scans and dimensional drawings).

[21] Pl. Ex. 3, Pl. App. 534-35 (Haugen Decl. ¶¶ 3-7).

[22] Pl. Ex. 4, Pl. App. 540 (Joseph Merrick Decl. ¶ 5); Pl. Ex. A-4, Pl. App. 81, 84 (Jacob Haugen Dep. at 14:1-7, 24:4-25); Pl. Ex. A-3, Pl. App. 73-74 (Merrick Dep. at 37, 43:12-25).

[23] Pl. Ex. 7-A, Pl. App. 612-16 (Phanid Decl.); Pl. Ex. A-6, Pl. App. 98, 100-02 (Phanid Dep. at 11:11-12, 14:1-16:22).

[24] Pl. Ex. A-6, Pl. App. 100-05 (Phanid Dep. at 14-19, 29).

Figure 1:  Comparison of Bullet Shapes [Dkt. No. 74 at 23]



Provident .45 ACP        NWTM SBB .45 ACP    Live .45 ACP

Provident instructed NTR on how to make a head stamp, asking that it look as similar to

live ammunition as possible, and that it include the weight, purity, composition, and "PM,"

Provident's "mint mark."[25]  Provident claims that the ordering and orientation of the words on its

head stamp are consistent with the usual practice for bullion products, and that Provident has

used similar stamping techniques on its other silver and copper coin and medallion products.[26]

Phanid, Provident's designer, claims he chose the Tahoma font on the head stamp by simply

selecting the font that looked most similar to the lettering on live ammunition.[27]

---

[25] Pl. Ex. A-4, Pl. App. 88 (Haugen Dep. at 112:4-6).
[26] Pl. Ex. 7, Pl. App. 612-16, 627-28 (Phanid Decl., Ex. G (Screen view of ArtCad's TAHOMA font)).
[27] *Id.* at Pl. App. 613, 627-28.

Figure 2:  Comparison of Head Stamps [Dkt. No. 74 at 31]



Provident's "in-house creative guy," Josh Merrick, designed the packaging for

Provident's replica bullets to "look like an ammo box."[28]  Provident began selling one-ounce

copper replicas of the .45 ACP in May 2013, twenty-one ounce copper .45 ACP replicas in

September 2013, two-ounce copper 308 Winchester replicas in October 2013, one-ounce silver

.45 ACP replicas in November 2013, five-ounce silver 12 gauge shotgun shell replicas in May

2014, ten-ounce silver .50 BMG replicas and 25-ounce silver 20 MM replicas in December 2014,

and 100-ounce silver 30 MM replicas in March 2015.[29]

---

[28] Pl. Ex. A-3, Pl. App. 74 (Merrick Dep. at 43:12-25).
[29] *Id.* at Pl. App. 67-69 (Merrick Dep. at 14:2-16:23).

Figure 3:  Comparison of Packaging [Dkt. No. 74 at 30]



### III.    NWTM Contacts Provident

Provident claims it first learned about NWTM's replica bullets in the summer of 2013.[30]

Steve Loftus, an executive of NTR, showed executives at Provident a YouTube video from

NWTM's website.[31]  At the meeting, Mr. Loftus allegedly remarked that it "look[ed] easy" to

make bullets.[32]  NWTM argues this to be circumstantial evidence of copying.[33]

On July 15, 2013, on behalf of NWTM, Hansen called Provident, and stated that

Provident was infringing NWTM's intellectual property rights.  A cease-and-desist letter

followed, claiming Provident was unlawfully copying NWTM's Silver Bullet Bullion .45 Caliber

ACP round, in violation of NWTM's copyright and trademark rights.[34]

---

[30] Pl. Ex. A-4, Pl. App. 80-83 (Haugen Dep. at 13-14, 20-21); Pl. Ex. A-3, Pl. App. 71-72 (Merrick Dep. at 26, 28).
[31] Pl. Ex. A-4, Pl. App. 80-84 (Haugen Dep. at 13-14, 20-21, 24).
[32] Def. Ex. A-1, Def. App. 6 (Haugen Dep. at 22).  Although disputed, this fact is presumed in favor of the non-movant, NWTM.
[33] Dkt. No. 74 at 2–3, 13 (Def.'s Resp. Br.).
[34] Pl. Ex. B, Pl. App. 124 (Hansen Dep. at 43); Dkt. No. 10 ¶ 14; Dkt. No. 19-3.

## IV.   NWTM's Trademark and Copyright Applications

NWTM has filed three trademark applications relating to its replica bullets.  On January 16, 2013, NWTM filed an intent-to-use application with the Patent and Trademark Office (PTO) for "SILVER BULLET BULLION," for use in association with "[p]recious metals, namely, gold and silver bullion."[35]  NWTM disclaimed the term "BULLION" during prosecution of the application, and the mark was published for opposition on June 25, 2013, as to which Provident instituted its opposition to the registration on October 18, 2013.[36]  The PTO suspended further proceedings on January 13, 2014, pending the outcome of this suit.[37]

On August 2, 2013, NWTM filed another intent-to-use application for "BULLET BULLION," for use in association with "[p]recious metals, namely gold and silver bullion."[38]  On September 3, 2013, the PTO issued an office action, refusing to register the applied-for mark under 15 U.S.C. § 1052(e)(1), because the mark "merely describes a characteristic of [NWTM's] goods and/or services."[39]  On March 3, 2014, NWTM responded to the office action, disclaiming the term "BULLION," electing not to address the likelihood of confusion with prior applications, and disputing the PTO's characterization of the mark as merely descriptive.[40]  On April 14, 2014, the PTO sent NWTM a notice suspending the mark until final disposition of a prior application filed by a person not involved in this suit.[41]  The examiner maintained the rejection, based on the conclusion that "BULLET BULLION" was merely descriptive of the products.[42]

---

[35] Pl. Ex. L, Pl. App. 270-455 (Hessler Decl.).
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at Pl. App. 379-80.

On March 7, 2014, NWTM filed another intent-to-use application for "COPPER

BULLET BULLION."  The examiner approved the mark for publication on June 12, 2014, and

the mark was published on July 22, 2014.  Provident filed its opposition on October 30, 2014.[43]

On June 5, 2014, NWTM filed five copyright applications, seeking protection for the five

types of silver replica bullets it offers for sale in direct competition with Provident's replica

bullets.[44]  The copyright applications describe NWTM's replica bullets as "sculpture[s]."[45]

On November 18, 2014, the U.S. Copyright Office denied registration to NWTM because

the new material did "not contain a sufficient amount of original authorship."[46]  On December 1,

2014, NWTM informed the Court that it would seek reconsideration from the Copyright

Office.[47]

## V.    Claims in this Suit

On July 29, 2013, Provident filed this declaratory judgment action, alleging that NWTM

has no valid or enforceable trademark, trade dress, or copyright rights that preclude Provident

from making and selling its replica bullets.[48]  On September 27, 2013, NWTM filed its First

Amended Answer, asserting counterclaims for trademark infringement and unfair competition

under federal and Texas law.[49]  On June 10, 2014, NWTM filed a Motion for Leave to File

Second Amended Answer and Counterclaims, seeking to assert new counterclaims for trade

---

[43] *Id.* at Pl. App. 433-55.
[44] Dkt. Nos. 46-6 – 46-10.
[45] *Id.*
[46] Dkt. Nos. 77, 77-1 (Letter from U.S. Copyright Office).
[47] *Id.*  If the Copyright Office were to refuse NWTM's request for reconsideration, NWTM may submit a second request, which would be considered by the Copyright Office Board of Review. *Id.*  To date, the Court has not received any further updates regarding NWTM's copyright applications.
[48] Dkt. No. 1.
[49] Dkt. No. 19.

dress and copyright infringement, which the Court denied at a September 11, 2014 hearing,

before giving Provident leave to move for early summary judgment on the existence, validity,

and enforceability of NWTM's trademark, trade dress, and copyright rights.[50]

## ANALYSIS

### I.      LEGAL STANDARD

Summary judgment is proper if the pleadings, discovery, supporting affidavits, and other

materials show that there is no genuine issue as to any material fact, and that the movant is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue of material fact

exists when a reasonable jury could find for the nonmoving party.  *Gates v. Tex. Dep't of*

*Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party bears the initial burden of identifying

those portions of the record that demonstrate the absence of a genuine issue of material fact.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140

F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).  Once the movant carries its

initial burden, the burden shifts to the nonmovant to show that summary judgment is

inappropriate, by designating specific evidence beyond the pleadings that demonstrate the

existence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Fields v. City of S. Houston*, 922 F.2d

1183, 1187 (5th Cir. 1991).  In determining whether genuine issues of material fact exist,

"factual controversies are construed in the light most favorable to the nonmovant, but only if

both parties have introduced evidence showing that an actual controversy exists." *Lynch Props.*,

140 F.3d at 625 (citation omitted).

---

[50] Dkt. No. 68.

## II.      DISCUSSION

### A.  Trademark Infringement

#### 1.  Distinctiveness

Trademark infringement claims are governed by the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which defines "trademark" as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others . . . ." 15 U.S.C. § 1127.  There are essentially four categories of terms with respect to trademark protection, listed in order of increasing legal protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).  To be protected, a mark must be "distinctive," which means "[the mark's] intrinsic nature serves to identify a particular source." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 537 (5th Cir. 2015) (quoting *Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210–11 (2000)).  According to the *Abercrombie* test adopted by the Fifth Circuit, "suggestive, arbitrary, and fanciful marks are inherently distinctive," but "generic marks cannot be distinctive, and descriptive marks are distinctive only if they have acquired 'secondary meaning.'"  *Id.* (quoting *Abercrombie*, 537 F.2d at 9).

Courts examine the context in which the challenged words are used to determine in which of the categories they belong.  *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 847 (5th Cir. 1990).  Summary judgment is rarely appropriate on the issue of categorization unless the record compels the conclusion that the movant is entitled to judgment as a matter of law.  *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009).

12

Descriptive marks, as distinguished from suggestive marks, are not entitled to protection absent secondary meaning. "A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241 (5th Cir. 2010) (citation omitted). For example, "descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services . . . ." *Id.* The Fifth Circuit has repeatedly cautioned that "the concept of descriptiveness must be construed rather broadly." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 792 (5th Cir. 1983) (internal quotation marks and citation omitted), *abrogated on other grounds by KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 (2004).[51]

To determine descriptiveness, courts use the "'imagination test,' which 'seeks to measure the relationship between the actual words of the mark and the product to which they are applied.'" *Nola Spice*, 783 F.3d at 539 (quoting *Zatarains*, 698 F.2d at 792). "If a word requires imagination to apply it to the product or service in question, it tends to show that the term as used is suggestive." *Union Nat. Bank*, 909 F.2d at 848 (citation omitted). Conversely, "if the word conveys information about the product, it is descriptive." *Id.* Essentially, descriptive marks require no mental leap for the purchaser to connect the significance of the mark to the goods or services. *In re Chamber of Commerce*, 675 F.3d 1297, 1298 (Fed. Cir. 2012). As an alternative test, courts ask "whether others in the same business would generally need the word to

---

[51] Although the Fifth Circuit used the name "Zatarain's, Inc." with an apostrophe between the "n" and "s" in the text of its opinion, the style of the case as reported in West's Federal Reporter is *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.* 698 F.2d at 786–88 ("At issue is the alleged infringement of two trademarks . . . held by appellant Zatarain's, Inc. ("Zatarain's").) In *KP Permanent Make–Up*, the Supreme Court cited the case as *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, and this Court will do the same. However, when referring to the party, Zatarain's, Inc., this Court will use "Zatarain's," as did the Fifth Circuit.

adequately describe their product or service." *Union Nat. Bank*, 909 F.2d at n. 22 (explaining that "the *need* to use a term because it is generic or highly descriptive should be distinguished from the *desire* to use it because it is attractive").

Here, the Court finds that the SILVER BULLET BULLION (hereinafter, "SBB"), COPPER BULLET BULLION (hereinafter, "CBB"), and BULLET BULLION (hereinafter, "BB") marks are descriptive, because they immediately convey the characteristics, qualities, and ingredients of NWTM's replica bullets without requiring the consumer to make any mental leap.[52]  NWTM is seeking to use SBB, CBB and BB in connection with precious metals, including both gold and silver bullion in the form of bars and ingots that are suitable for further processing.  *See* Dkt. No. 72-1 at 25 n. 13 (bullion is used in a generic sense); *see also Bullion Definition,* Dictionary.com, http://dictionary.reference.com/browse/bullion (last visited July 25, 2015) (defining "bullion" as "gold or silver considered in mass rather than in value" or "gold or silver in the form of bars or ingots").  Furthermore, although copper is not conventionally understood to be bullion, NWTM notes in its Response that, "[g]iven the increases in the prices of copper in recent years, or even theft of copper from building[s] . . . it was reasonable for the examining attorney at the PTO to interpret the term 'bullion' loosely enough to include copper," and "[t]he Provident website also refers to its copper products under a website heading of 'Copper Bullion.'"  Dkt. No. 74 at 15; *see also Bullion Definition*, Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/bullion (last visited July 25, 2015) (defining "bullion" as "metal in the mass").  Thus, the terms "silver," "copper," and "bullion" merely describe the composition of NWTM's replica bullets.

---

[52] It is worth noting that the PTO reached the same conclusion when it refused to register the BB mark.  *See* Pl. Ex. L, Pl. App. 392 (Section 2(e)(1) Refusal – Merely Descriptive).

NWTM asserts that its marks are suggestive, not descriptive, and that the marks were meaningless prior to the existence of NWTM's replica bullets, and that consumers might have conjured from them images of bars or coins with artwork related to bullets printed on them. Thus, NWTM argues that imagination is required to relate SBB, CBB, and BB to its products. Accordingly, NWTM contends that the marks are suggestive of a bullion piece in the general shape of a bullet.  NWTM also notes that the SBB and CBB marks have been published for opposition by the PTO, which occurs only after the examining attorney determines the marks are not descriptive and are entitled to registration on the principal register.

NWTM's arguments are unavailing.  First, NWTM is not entitled to any presumption that the SBB and CBB marks are not descriptive merely because they were published for opposition. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005) (citation omitted) (holding that registration, and not publication, is "*prima facie* proof" that a mark is distinctive); *Merritt Forbes & Co. Inc. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 954 (S.D.N.Y. 1985) ("Where a mark is not registered, there is no presumption of the mark's validity.").

Second, under the "imagination test," the Court must analyze the words of the marks and their relationship to the replica bullets.  The words of the marks only convey information about the products with which they are associated.  "Silver" and "copper," coupled with "bullion," describe the material that the replica bullet is composed of, and "bullet" describes a replica bullet's shape.  This is true with respect to each of the SBB, CBB, and BB marks.  The arguable novelty of NWTM's replica bullets, and the mere possibility that someone might conjure from SBB, CBB, and BB an image of a bar or coin with bullet artwork, do not negate the fact that each term used in the marks conveys information about the characteristics of NWTM's products.

Additionally, under the alternative test, which asks "whether others in the same business

would generally need the word to adequately describe their product or service," NWTM's competitors would almost certainly need to use the words in the SBB, CBB, and BB marks to describe their products. NWTM relies on the Ninth Circuit's discussion contrasting descriptive and suggestive marks in *AMF, Inc. v. Sleekcraft Boats*, in which the trademark "Slickcraft" was found to be suggestive. 599 F.2d 341, 349–50 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003). The court in *AMF* articulated the imagination test as a measure of "how immediate and direct . . . the thought process [is] from the mark to the particular product." *Id*. The court found that the disputed mark, "Slickcraft," "might readily conjure up the image of appellant's boats, yet a number of other images might also follow." *Id*. at 349. The court also considered whether the mark would preclude legitimate use of the mark by other sellers, and found no evidence that others used or wanted to use Slickcraft to describe their products. *Id*. Finally, the court considered whether the mark was "actually viewed by the public as an indication of the product's origin or as a self-serving description of it," and found that buyers would probably understand Slickcraft to be a trademark, particularly because it was used in conjunction with the mark AMF. *Id*. Taking into account the foregoing, the court found Slickcraft was suggestive when applied to boats. *Id*.

Here, in contrast to the Slickcraft mark in *AMF*, Provident has provided ample evidence that it has used and desires to use the SBB, CBB, and BB terms to describe its goods (and logically others in the bullion line of business would desire to use the terms as well). There are simply a limited variety of descriptors that can be used to describe products of this sort, and granting NWTM the trademarks it seeks would effectively preclude potential competitors from marketing goods with the terms "bullet" or "bullion." NWTM has simply not addressed how its competitors could describe their products without using the terms employed in NWTM's SBB,

CBB, and BB marks, thereby causing the Court, applying either test, to find the marks descriptive.

## 2. Secondary Meaning

Because Provident has established the marks as descriptive, and rebutted the presumption of inherent distinctiveness, NWTM must show the marks have acquired secondary meaning. *Nola Spice*, 783 F.3d at 537 (quoting *Abercrombie*, 537 F.2d at 9). "Secondary meaning occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008) (citation and internal quotation marks omitted). "The inquiry is one of the public's mental association between the mark and the alleged mark holder." *Amazing Spaces*, 608 F.3d at 247–48 (quoting *Smack Apparel*, 550 F.3d at 476). The determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry. *Sunbeam Products, Inc. v. W. Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997).

Because the SBB, CBB, and BB marks are descriptive, NWTM bears the burden of showing secondary meaning. *See Nola Spice*, 783 F.3d at 543 (citation omitted). The burden to establish secondary meaning is substantial and requires a high degree of proof. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005). Seven factors determine whether secondary meaning has been established:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress [or mark].

*Amazing Spaces*, 608 F.3d at 248. "While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers

17

between a product and its source." *Zatarains*, 698 F.2d at 795.

NWTM does not argue explicitly that its marks have acquired secondary meaning, and NWTM has not produced any evidence to support a finding of secondary meaning as to the SBB, CBB, or BB marks. Additionally, "'in a borderline case where it is not at all obvious that a designation has been used as a mark, survey evidence may be necessary to prove trademark perception.'" *Nola Spice*, 783 F.3d at 546 *(*quoting *Amazing Spaces*, 608 F.3d at 249). At the June 30, 2015 hearing on Provident's Motion for Summary Judgment, NWTM's counsel stated that it lacked survey evidence because NWTM's customers tend to buy bullion as a hedge against what they see as the U.S. government's failing monetary policy, and those same customers would be skeptical of a phone call inquiring about the manufacturer of the bullion products they own. This reasoning does not excuse NWTM from its burden of proof to show secondary meaning, and NWTM proffers no other evidence to support secondary meaning as to the SBB, CBB, and BB marks.[53] This Court finds, therefore, as a matter of law, that the disputed marks have not acquired secondary meaning.

Because the "SILVER BULLET BULLION," "COPPER BULLET BULLION," AND "BULLET BULLION," marks are descriptive and have not acquired secondary meaning, they are not legally protectable, and summary judgment is **GRANTED** on behalf of Provident as to the validity and enforceability of NWTM's asserted trademark rights.[54]

---

[53] NWTM admitted that SBB had not acquired secondary meaning as defined in 15 U.S.C. § 1052(f). Pl. Ex. E, Pl. App. 196 (NWTM Resp. to Pl.'s First Request for Admission).NWTM relies on Facebook posts and a YouTube video to support its secondary meaning argument for trade dress protection. *See* Dkt. No. 74 at 13–14. However, as is discussed in further detail regarding NWTM's asserted trade dress, the Court finds that evidence inadmissible, and NWTM's other proffered evidence is inadequate to establish secondary meaning.

[54] The Lanham Act also prohibits registration of marks which are "deceptively misdescriptive" of the goods they are used in connection with. 15 U.S.C § 1052(e)(1). Accordingly, Provident alternatively argues that CBB is not a valid mark because it is legally misdescribed in NWTM's

**B.  Trade Dress**

NWTM seeks the following trade dress protection for its replica bullets, described as a

bullion piece of silver or copper that:

(1)      has a head stamp with a central circular groove (which suggests the primer cap for a real

         bullet), surrounded by the following information in a circular pattern towards the outer

         edge of the base of the bullion piece:

         (a) metal designation such as "Ag" or "Cu";

         (b) indication of purity;

         (c) a weight; and

         (d) abbreviation for the company name;

(2)      is sold in packaging that evokes a military or gun enthusiast feel by including:

         (a) a caliber designation that is suggested by the general shape of the bullion piece (i.e.,

         .45 ACP, 7.62 NATO (or .308), .50 BMG, or 20 MM, or 12 gauge for shotgun shell);

         (b) a designation of "grains" associated with gun powder of the bullet, giving an

         indication of the power of the associated real bullet type; and

         (c) is sold in boxes in rows that evoke the feeling of a real box of ammunition, or in a

         plastic bag container with the same information in (a) and (b); and

(3)      while not being an exact copy or "replica" of a real bullet, has the shape of the bullion

---

trademark application as being for use in connection with precious metals, namely gold and
silver.  According to Provident, precious metals do not include copper, and NWTM has admitted
as much.  *See* Pl. Ex. B, Pl. App. 115, 117-18 (Hansen Dep. at 17, 23-24).  NWTM responds that
it was reasonable for the examining attorney to decide that the term bullion loosely includes
copper, and even Provident's website refers to its accused copper products as "Copper Bullion."
*See* Dkt. No. 74 at 15; Pl. Ex. P-A-4, Pl. App. 538 (Provident website showing "Copper Bullets"
under "Copper Bullion" menu).  Because the Court finds that the CBB mark is descriptive and
lacks secondary meaning, the Court does not reach the issue of whether CBB is misdescriptive.

piece that evokes the feeling of such a bullet.

Dkt. No. 74 at 10–11.

To qualify for trade dress protection, the "trade dress must be nonfunctional and either be inherently distinctive or have secondary meaning." *Clearline Technologies Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 700 (S.D. Tex. 2013) (citing *Wal-Mart Stores*, 529 U.S. at 210). As discussed below, the Court finds NWTM's trade dress is functional, and thus does not qualify for trade dress protection. Moreover, NWTM's trade dress is neither inherently distinctive, nor has it acquired secondary meaning.

### 1. Functionality and Inherent Distinctiveness

The Supreme Court has held that the traditional test of functionality is whether the product feature "is essential to the use or purpose of the article or if it affects the cost or quality of an article." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995). More simply, if the feature is "the reason the device works," it is considered functional. *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001)). "A feature is essential to the use or purpose of a product if it serves any significant function other than to distinguish a firm's goods or identify their source." *Poly–Am., L.P. v. Stego Indus., L.L.C.*, No. 3:08–CV–2224–G, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011) (Fish, J.). Alternatively, aesthetic features are functional if their exclusive use would place "competitors at a significant non-reputation-related disadvantage." *Clearline Technologies*, 948 F. Supp. 2d at 700 (quoting *Qualitex*, 514 U.S. at 165). If the trade dress is composed of individual elements, only some of which serve a functional purpose, "the trade dress may be protectable so long as the combination of these individual elements" which define the trade dress, i.e., the "overall impression," are configured

20

in an arbitrary, fanciful, or distinctive fashion. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991) *aff'd sub nom Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

### a.  Head Stamp

The Court finds that NWTM's head stamp is functional because it identifies the weight, composition, purity, and source of the bullion used to make NWTM's replica bullet, which is apparently standard practice for bullion products. *See* Pl. Ex. G, Pl. App. 627-28 (Phanid Decl. ¶ 27) (explaining that Provident's head stamp process replicated the same stamping process Provident uses for other bullion products); Pl. Ex. A-4, Pl. App. 91 (Haugen Dep. at 115:6-10) ("Bullion products . . . are sold [and] labeled that way, whether it's a 1-ounce round, a 10-ounce bar, a 100-ounce bar, they all say the ounce, the purity . . . and the composition, the element.  It is a very standard practice.  Everybody does that."); Pl. Ex. N, Pl App. 467-75 (showing Provident's bullion coins with "silver," "troy ounces," and other "standard" identifying information).  NWTM does not dispute that the identifying information on the head stamp is standard in the industry; instead, it focuses on the orientation of the lettering, and the head stamp's location on the replica bullet.  Dkt. No. 74 at 8–10 (Def.'s Resp. Br.).

NWTM argues it has is protectable trade dress because (1) the head stamp is non-functional because the information it conveys could be located anywhere on the bullion piece, in any orientation or arrangement; and (2) the combination of elements in its products—the head stamp, shape, and packaging—have a consistent look that is inherently distinctive, like the alcoholic beverage pouches at issue in *American Beverage Corporation v. Diageo North America, Inc.*, 936 F. Supp. 2d 555, 596 (W.D. Penn. 2013).

NWTM has not met its burden of showing the head stamp is non-functional, particularly

because the features that comprise the head stamp, and the head stamp considered as a whole, were designed to emulate the head stamp on actual ammunition, and therefore, are "essential to the use or purpose" and "affect the cost or quality" of the head stamp.  *See Qualitex*, 514 U.S. at 165 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10 (1982)) (explaining that a feature is functional if "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage"); *Inwood Labs.*, 456 U.S. at 850 n. 10 (citations omitted) ("In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."); Pl. Ex. A-1, Pl. App. 28 (Shaudis Dep. at 70:8-10) ("The head stamps on Northwest's Silver Bullet Bullion pieces were designed to emulate a format which most likely simulated that of ammunition.").  NWTM sought to establish a link with military service members, veterans, and gun enthusiasts.  Def. Ex. A-5, Def. App. 100 (Shaudis Dep. at 35:20-22).  Thus, the head stamp is functional because it emulates actual ammunition, which would give NWTM a non-reputation-related advantage over its competitors, particularly in appealing to military service members and gun enthusiasts, who would very likely perceive head stamps that did not resemble actual ammunition as being of lesser quality.  *See* Dkt. No. 74 at 25–26 (citing *id.* at Def. App. 94-96 (Shaudis Dep. at 13:24-14:5, 27:4-9)) ("Mr. Shaudis has served in the military in the [sic] Iraq and Afghanistan theatres, so he is intimately familiar with the 'feel' of the markings on real ammunition, including at the base [of actual bullets].").

Furthermore, the head stamp is not inherently distinctive.  Each of its features emulate the head stamp on actual ammunition—it uses a standard font, and the circular groove on the base simulates the primer of actual ammunition.  Pl. Ex. A-2, Pl. App. 29 (Shaudis Dep. at 71:15-18) (Q: "Well, now, you didn't invent that type face [sic], did you?" A: Not the type face [sic], no, I

did not.  It's one of many standard ones that are available."); *id.* at Pl. App. 24–28 (Q: [the three ring groove in the bottom of the replica bullet] . . . simulates the primer in live ammunition, correct? A: "It is a simulation of a primer in live ammunition, that is correct.").  To the extent the head stamp, together with other features, creates a distinctive, consistent look, that look is that of actual ammunition.  Finally, were the information conveyed in the head stamp located elsewhere on the bullet, it would undermine the theme and purpose of NWTM's replica bullets—emulating actual ammunition.

At the hearing on June 30, 2015, NWTM pointed to the "ALCOHOL IS IN IT!" text on the contested trade dress in *American Beverage* as analogous to the features on NWTM's head stamp.  However, in that case, the court found that the *majority of the claimed elements* were either "suggestive, arbitrary, or fanciful" and "taken as a whole, serve[d] to identify . . . the source of the product."  *Am. Beverage Corp.*, 936 F. Supp. 2d at 599.  In contrast, none of the claimed elements in NWTM's head stamp are "suggestive, arbitrary, or fanciful," either individually, or taken as a whole.  Furthermore, the court in *American Beverage* found that the words, "ALCOHOL IS IN IT!" merely suggested that the product contained alcohol, and some imagination was still required to determine the exact nature of the product.  *Id.*  Here, the features of the head stamp identify the exact nature of the product, particularly when viewed on the base of bullion shaped and sized like actual ammunition.  *See* Dkt. No. 74 at 10 ("NWTM seeks to protect the following trade dress . . . a head stamp with a central circular groove (which suggests the primer cap for a real bullet) . . . .").  Additionally, the "ALCOHOL IS IN IT!" text in *American Beverage* was not functional, i.e., it was not essential to the use of the beverage, it did not affect the cost or quality of the beverage, and exclusive use of the text did not put competitors at a significant non-reputation-related disadvantage.  936 F. Supp. 2d at 599–600.

As already discussed, NWTM's head stamp contains the metal designation, purity, weight, and "NWTM," and its base is designed such that it simulates actual ammunition, and any competitor selling replica bullets without a head stamp simulating actual ammunition would be at a significant non-reputation-related disadvantage.  Accordingly, the head stamp is functional, not inherently distinctive, and distinguishable from the trade dress at issue in *American Beverage*.

### b.  Packaging

NWTM again relies on *American Beverage*, which considered the protectability of a line of frozen alcoholic beverages packaged in uniquely shaped pouches.  936 F. Supp. 2d at 596. There, the court found that the dress at issue had a consistent look and was protectable because it had a commonality of features, and all the products had exactly the same size and shape of packaging, and shared common graphic elements that contributed to the consistency of the line, including an hourglass shape, with similar text, layout and imagery.  *Id.*  NWTM compares the features of its packaging to the pouch in *American Beverage*, arguing that the features of both types of packages contribute to the consistent overall look of its products.  NWTM packaging references the caliber of ammunition and the grain count, which make the packaging resemble, and evoke the feel of, real ammunition boxes.  *See* Pl. Ex. P, Pl. App. 524 (picture of NWTM packaging).

Here, similar to the head stamp, the Court finds that the packaging is functional because it is assembled to emulate actual ammunition boxes.  It does not serve to identify NWTM as a source, but instead serves to remind consumers of an actual ammunition box, and allowing it to do so with trade dress protection would put NWTM's competitors at a significant non-reputation-related disadvantage.  Moreover, for the reasons already discussed with respect to the head stamp, the features that make the packaging functional also doom NWTM's arguments

about the packaging's inherent distinctiveness.

Even if its packaging were both distinctive and non-functional, the Court finds as a matter of law that there is no infringement with respect to the packaging because there is no likelihood of confusion between NWTM's and Provident's packaging. Provident prominently features "PROVIDENT" on the outside of its boxes, with a bullseye substituted for the "O" in Provident, and the text on Provident's packaging is inscribed directly on the top of the boxes. *See* Pl. Ex. P, Pl. App. 523. In contrast, NWTM's boxes have text inscribed on a label on the outside cover that includes many of the descriptive features included on the head stamp—the number of cartridges, the caliber, grain count, weight, substance, manufacturer, and date of inspection. *Id.* at Pl. App. 522. "NWTM" is inconspicuously included on the bottom left corner of the label. *Id.* Given the prominence and layout of Provident's name on the outside of its box, the Court finds that Provident's packaging is not substantially similar to NWTM's as a matter of law. NWTM has not provided any meaningful evidence to support a likelihood of confusion other than the general shape.

### c. Shape

The shapes of NWTM's replica bullets cannot be protectable as trade dress because they are not distinctive, and merely copy the shapes of actual bullets. To the extent there are differences between NWTM's products and actual ammunition, those differences are non-perceptible to actual consumers, and are functional in a similar sense to the head stamp and packaging. The changes in dimension and weight were designed to make products that weighed in even troy ounces—"the weight dictated the form," making the differences between NWTM's replica bullets and actual ammunition functional. *See* Pl. Ex. B, Pl. App. 125 (Hansen Dep. at 50).

25

NWTM argues that the shape of the replica bullets, together with the packaging and head stamp, establish inherent distinctiveness because the elements, considered as a whole and in combination, establish distinctiveness: the "total impression" is unique to NWTM and identifies NWTM as a source of the product that includes the head stamp, packaging, and shape of the replica bullets.

NWTM's argument is not persuasive.  Similar to the head stamp and packaging, the shapes of the replica bullets are modeled after actual ammunition, and therefore are functional. Moreover, NWTM sought to calibrate the shape and weight of the replica bullets to even troy ounces, in part, to give the replica bullets intrinsic value as an alternative financial investment. Pl. Ex. B, Pl. App. 138 (Hansen Dep. at 135:16-21) ("And we put it to some sketches, some ideas of possible shapes.  We actually acquired some ammunition, sat back and did some volumetrics of . . . how much in a .45 round, you know, what size?  Because we need . . . silver to be as close as it can, in most cases close to even weights."); *id.* at Pl. App. 139 (Hansen Dep. at 136:2-4 ("And we said, 'Okay, what's a popular shape?  What's a popular size that the volume would approximate some even weights?'"); *id.* at Pl. App. 125 (Hansen Dep. at 50:14-21) ("We wanted to make it exactly two troy ounces . . . [a]nd so the weight dictated the form."); Pl. Ex. A-2, Pl. App. 52 (Neumann Dep. at 48:18-24) ("I don't know that it's a replica, but . . . the purpose is so that people when they are buying this product . . . it has intrinsical [sic] value.  It's always basically almost like money.  It's always . . . identified by a . . . mint as being pure silver so it could be . . . bought and sold as based on the silver content and weight.").  Thus, because the shape of NWTM's replica bullet is designed to emulate an actual bullet, and the replica bullet's differences with an actual bullet were created by a desire to have the replica bullet weigh in even troy ounces, the shape is clearly functional.

Moreover, NTWM's general argument that *American Beverage* is analogous to the instant case is not persuasive, and does not establish NWTM's replica bullets' shape as distinctive. In that case, the court considered cocktail products sold in pouches with an hourglass shape when viewed from the front, a wedge shape when viewed from the side, and a lenticular shape when viewed from the bottom. 936 F. Supp. 2d at 568–69. The court found inherent distinctiveness because "[t]he hourglass shape of the Daily's frozen cocktail products' packaging is entirely arbitrary or fanciful insofar as it provides no indication of what the product is or what the package contains." *Id.* at 599. The court found that the "overall impression" of the elements, including the shape and combination of text, images, and layout of the packaging, served to identify the source of the product. *Id.* at 600. In contrast, here the overall impression of the elements, each of which has only trivial differences with the features of actual ammunition, serves to identify NWTM's product as a bullet. Furthermore, the plaintiff in *American Beverage* was not trying to emulate a widely recognized object, such as a bullet. This Court, therefore, finds that the shape of NWTM's replica bullets is functional and not distinctive.

## 2. Secondary Meaning

Because NWTM's trade dress is functional, it is not protectable, regardless of whether it has secondary meaning. Nonetheless, this Court finds that even if NWTM's trade dress were nonfunctional, it is not protectable, because NWTM has not produced sufficient evidence to support a finding of secondary meaning. "Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Smack Apparel*, 550 F.3d at 476 (citations and internal quotation marks omitted). "The inquiry is one of the public's mental association between the [dress] and the alleged [dress] holder. *Id.* Seven factors determine whether secondary meaning has been established:

(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Amazing Spaces*, 608 F.3d at 248.

The burden to establish secondary meaning is substantial and requires a high degree of proof. *Test Masters*, 428 F.3d at 567. NWTM argues that it has presented evidence of secondary meaning, including (1) NWTM heavily promoted the new product category on its website and with e-mail blasts, and it was a "hot product," that would, and did, sell; (2) NWTM sold in excess of 191,000 pieces in total of Silver Bullet Bullion and Copper Bullet Bullion through June 2014; (3) NWTM had 100% of the market share for the entire product category of Silver Bullet Bullion from January to October 2013; (4) there is strong circumstantial evidence that NTR copied NWTM's head stamp; and (5) evidence of actual confusion that consists of (a) NWTM's CEO's testimony that at least four customers contacted him to ask whether Provident's products were in fact manufactured by NWTM; (b) an alleged customer on Provident's Facebook page was similarly confused about the source of Provident's products; and (c) a video on the "Salivate Metal" YouTube channel that featured a reviewer pondering whether the real manufacturer of Provident's product was actually NWTM.

Even if the Court were to determine that all of the foregoing evidence unambiguously weighed in favor of NWTM, the determination of whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry. *Sunbeam Products*, 123 F.3d at 253. Here, there is a complete absence of empirical evidence in the record. NWTM has not offered any admissible consumer testimony or survey evidence to support a finding of secondary meaning.[55]

---

[55] The YouTube video, Facebook posts, and phone calls to the CEO of NWTM are hearsay and inadmissible as evidence of confusion, as this Court made clear at the hearing on September 11,

"While survey evidence is not required to establish secondary meaning, it is 'the most direct and persuasive way of establishing secondary meaning.'"   *Nola Spice*, 783 F.3d at 546 (quoting *Amazing Spaces*, 608 F.3d at 248).   As already discussed, NWTM's explanation for not providing survey evidence, although plausible, does not relieve NWTM from its burden of proof, particularly given that its customers constitute a unique demographic.   *See* Def. Ex. A-5, Def. App. 100 (Shaudis Dep. at 35) (explaining that NWTM sought to appeal to military veterans and gun enthusiasts).

The time of use weighs against NWTM.   In *Nola Spice*, the Fifth Circuit affirmed the district court's grant of summary judgment of no secondary meaning, finding that the contested mark had only been used for a "relatively brief" three-and-a-half year period before the accused product entered the market.   783 F.3d at 544 (citing *Amazing Spaces*, 608 F.3d at 248 (finding no secondary meaning as a matter of law where the mark was used for ten years); *Bank of Tex. v. Commerce Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (finding no secondary meaning as a matter of law despite nine years of use)).   Accordingly, NWTM's exclusive market share for the product category of Silver Bullet Bullion, from January 2013 to October 2013, cannot establish secondary meaning.   *See* Dkt. No. 74 at 13 (Def. Resp. Br.) (citing Dkt. No. 72-1 at 16–19).

The amount of NWTM's sales is a closer call.   For example, in *Zatarains*, the Fifth Circuit affirmed the district court's finding of secondary meaning where Zatarain's sold 916,385 cases of Fish-Fri over a fifteen-year period.   *Zatarains*, 698 F.2d at 795–96; *see also Smack Apparel*, 550 F.3d at 478 (affirming summary judgment on secondary meaning where recent sales of products bearing the marks were greater than $93 million).   However, in *Nola Spice*, the

---

2014. Dkt. No. 71 at 33 (Sept. 11, 2014 Hr'g Tr. at 33:24-34:1).   Since the hearing, NWTM has not provided the Court with any plausible basis for admitting the foregoing purported evidence of confusion.

relevant sales of the party seeking protection were approximately 80 clothing items and 300 jewelry items, totaling $30,500 over a six-year period, and were found by the Fifth Circuit to be too low to establish secondary meaning.  783 F.3d at 544.  Here, NWTM sold in excess of 191,000 pieces in total of Silver Bullet Bullion and Copper Bullet Bullion from January 2013 to June 2014.  Def. Ex. A-2, Def. App. 88 (Def.'s Resp. to Interrogatory No. 2); Def. Ex. A-7, Def. App. 131 (Hansen Dep. at 195).  Although the magnitude of such sales is probably not sufficient, without more, to create a fact issue regarding secondary meaning, the sales are substantial over the relevant time period and would weigh in favor of secondary meaning were it a relevant consideration here.

As for NWTM's marketing efforts, "spending substantial amounts of money does not itself cause a mark or trade dress to acquire secondary meaning."  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TraFix*, 532 U.S. 23 (2001).  "The relevant question 'is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the dress] to the consuming public.'"  *Nola Spice*, 783 F.3d at 545 (quoting *Zatarains*, 698 F.2d at 795); *see also Amazing Spaces*, 608 F.3d at 248 (finding no secondary meaning as a matter of law despite $725,000 in advertising expenditures).  NWTM relies only on its assessment that its product was "hot," and that it sent out e-mail blasts and advertised on its website during the period it sold 191,000 pieces.  However, NWTM has provided no evidence about the amount of money it spent on marketing and developing its trade dress.  *See Nola Spice*, 783 F.3d at 544.  Much of NWTM's remaining evidence of secondary meaning suffers from the same deficiency—it does not demonstrate that the meaning of the trade dress has been altered in the minds of consumers—a deficiency that might have been cured had NWTM undertaken efforts to survey its customers.  *See Pebble Beach Co.*, 155 F.3d at 541.

Accordingly, the Court finds as a matter of law that the disputed trade dress does not have secondary meaning, and **GRANTS** summary judgment on behalf of Provident with respect to NWTM's trade dress claims—NWTM's trade dress claims regarding the head stamp, packaging, and shape are unsustainable as a matter of law.

### C. Copyright

#### 1. Originality

To prove copyright infringement, a plaintiff must first establish ownership of a valid copyright. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). "The *sine qua non* of copyright is originality." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). To be original, the work must have been "independently created by the author (as opposed to copied from other works), and [] possess[] at least some minimal degree of creativity." *Id.* Thus, "copyright is limited to those aspects of the work—termed 'expression'— that display the stamp of the author's originality." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir. 1994). Though a work may be original and copyrightable, copyright protection does not extend to the non-original elements of the work, "and the author has no right to prevent others from copying those elements that are not original." *Batiste v. Najm*, 28 F. Supp. 3d 595, 600 (E.D. La. 2014).

"Some material is unprotectable because it is in the public domain, which means that it is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268–69 (2d Cir. 2001) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d. Cir. 1992) (internal quotations omitted)). However, "a work may be protected by copyright even though it is based on . . . something already in the public domain if the author, through his skill and effort, has contributed

a distinguishable variation from the older works." *Batiste*, 28 F. Supp. 3d at 600 (citing 17

U.S.C. § 103(b)).  "A distinguishable variation must be substantial and not merely trivial."

*Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995).  A mere reproduction

of a work in a different medium does not constitute a sufficient variation to meet the originality

threshold for copyright protection.  *See L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d

Cir. 1976).

NWTM argues that its replica bullets are original because they do not correspond to

actual ammunition, and sometimes vary in dimension by a quarter of an inch or more.  *See* Def.

Ex. A-6, Def. App. 109-10 (Neumann Dep. at 25).  Neumann, NWTM's machinist, explained the

artistic process and the dimensional differences between NWTM's products and the actual

ammunition they replicate.  *Id.* at Def App. at 107-08; *see also* Def. Ex. A-2, Def. App. 53-54

(Phanid Dep. at 39-40).  NWTM argues that its products were the first of its kind.  Def. Ex. A-5,

Def. App. 53-54 (Phanid Dep. at 39-40).  NWTM further claims that there was significant

creative effort that went into making the product, including testing, trial and error, and the

creation of numerous prototypes, between 2008 and 2012.  Def. Ex. A-7, Def App. 125-28

(Hansen Dep. at 148-51).

NWTM also contends that its bullet is a "sculpture," or artistic creation, that evokes the

feel of a live round, but has non-trivial differences that make the product look better than the

original, such as the reshaped dome of the replica bullet.  Def. Ex. A-2, Def. App. 51, 56 (Phanid

Dep. at 37).  Contrary to Provident's argument, NWTM asserts that the differences are detectable

by the average consumer.  Shaudis, the designer who created the head stamp, sought to create a

feel of the product that established a link with the heritage of a military item.  Def. Ex. A-5, Def.

App. 103 (Shaudis Dep. at 35).

The Court finds that NWTM is not entitled to copyright protection because its replica bullets are comprised of elements that are already in the public domain, i.e., non-original, and any differences between the replica bullets and their actual ammunition counterparts are trivial or functional. *See Entm't Research Group v. Genesis Creative Group*, 122 F.3d 1211, 1221 (9th Cir. 1997) ("[P]urely functional, utilitarian or mechanical [aspects], will not be given any copyright protection."). The differences between NWTM's products and actual ammunition are (1) the composition, i.e., silver or copper; (2) the dimensions; (3) the shape; and (4) the weight. First, the composition is functional in that the substances used to compose the replica bullets are supposed to be a substitute for money and provide a hedge against inflation. *See* Pl. Ex. A-2, Pl. App. 52, 59-60 (Neumann Dep. at 48, 61, 63). The differences in dimensions and shape are also imperceptible and trivial, and to the extent they are not, the differences were driven by a desire to make a bullet in even troy ounces. *See* Pl. Ex. P-5-A, Pl. App. 547-611 (table setting forth a compilation of all the dimensional measurements). Pl. Ex. B, Pl. App. 138-41 (Hansen Dep. at 135-38). Finally, the difference in weight was also driven by a desire to make a replica bullet in even troy ounces. Pl. Ex. B, Pl. App. 138-41 (Hansen Dep. at 135-38) ("We actually acquire some ammunition . . . and did some volumetrics of . . . how much in a .45 round . . . what size? Because . . . we need silver to be as close as it can, in most cases to even weights."). In short, the evidence conclusively shows that NWTM sought to emulate actual ammunition, and to the extent it did not, the differences are imperceptible, trivial, or functional, in the sense that NWTM was trying to create a valuable bullion product that evinced actual ammunition.[56]

---

[56] NWTM argues that the threshold for originality, even in derivative works, is very low. Dkt. No. 74 at 24 (citing *Re-Alco Indus. v. Nat'l Ctr. for Health Educ.*, 812 F. Supp. 387, 393 (S.D.N.Y. 1993); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir. 1951)). However, the copyrights in those cases had already been registered, and the Fifth Circuit distinguished the *Alfred Bell* minimal standard in adopting its own standard for assessing the

Thus, as the Copyright Office has already held, this Court holds that the replica bullets are not copyrightable because they do not meet the originality requirement.

## 2. Merger

"[W]hen an idea can be expressed in very few ways, copyright law does not protect that expression, because doing so would confer a *de facto* monopoly over the idea. In such cases idea and expression are said to be merged." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir. 1994). Of course, if the idea of a replica bullet may be expressed in various ways, then the merger doctrine would not bar copyright protection. *See Nola Spice*, 783 F.3d at 549.

The idea and expression of NWTM's replica bullets have merged, so that the expression of a bullet in bullion cannot be separated from the idea, and thus NWTM's claim is additionally barred by the merger doctrine. There are only a few ways, if not only one way, of expressing a replica bullet in such a way that it is identifiable as famous ammunition. For example, the only way NWTM can express a .45 ACP design is to replicate it, and if NWTM were to make significant variations in its replica, the product would no longer be identifiable as a .45 ACP design. For example, NWTM claims by analogy that its replica bullets should be given copyright protection, because such protection was given to a photograph of puppies. Dkt. No. 74 at 24; *see Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992). However, there are numerous creative ways to depict puppies in a photograph. *Id.* at 307 ("Elements of originality in a photograph may

---

originality of already-registered copyrights. *See Donald v. Zack Meyer's T. V. Sales & Serv.*, 426 F.2d 1027, 1030 (5th Cir. 1970) (citing *Alfred Bell & Co.*, 191 F.2d at 102–03) (explaining that "something more than merely refraining from outright copying is required before a new variation on an old work has sufficient originality to be copyrightable" and "[t]he author must add 'some substantial, not merely trivial, originality,'" meaning "[t]he variation must be meaningful and must result from original creative work on the author's part.").

include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."). In contrast, there are very few nontrivial different ways to replicate a famous piece of ammunition in bullion form, and in the Court's view, NWTM's replica bullets are only a trivial variation on the actual ammunition they purport to replicate. Thus, even if NWTM's replica bullets were original, which they are not, the merger doctrine also precludes NWTM from receiving copyright protection for them.

Accordingly, the Court finds as a matter of law that the copyrights asserted by NWTM are invalid and enforceable, and **GRANTS** summary judgment on behalf of Provident with respect to NWTM's copyright claims.

### D.  State Law Claims

As NWTM has acknowledged, NWTM's trademark claims under state law depend on their viability under federal law. *See Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ) (citing *Union Nat. Bank*, 909 F.2d at 844). Thus, for the reasons already stated, NWTM's state law trademark claims must fail as a matter of law. However, NWTM also alleges state law claims for unfair competition and unjust enrichment.

### 1.  Unfair Competition

Although not specifically pled in its Amended Answer and Counterclaims, NWTM argues in its Response to Provident's Motion for Summary Judgment that Provident falsely represented to potential customers, in a manner intended to influence those customers' purchasing decisions, that there is such an entity as "Provident Mint," and that Provident has its own mint that allows it to minimize manufacturing costs, which it passes along as savings to its customers. Def. Ex. A-1, Def. App. 19-22, 33-39 (Haugen Dep. at 121-25); Pl. Ex. 3-A, Pl. App.

538 (Advertisements from www.Providentmetals.com).  The record shows that Provident pays its affiliate, NTR Metals, to manufacture the replica bullets, which are, in fact, cheaper than NWTM's products, as evidenced by the website screenshots cited by NWTM in its Response. *See* Dkt. No. 74 at 32 (Def. Resp. Br.) (citing Pl. Ex. M, Pl. App. 461, 463-64 (screen shots from www.SilverBulletBullion.com); Pl. Ex. 3-A, Pl. App. 536 (Advertisements from www.Providentmetals.com)).  NWTM has acknowledged the affiliation, noting that NTR and Provident are both owned by Elemental LLC.  Dkt. No. 74 at 42 (citing Def. Ex. A-3, Def. App. 61, 69 (Merrick Dep. at 9:6-12, 56:8-14)).

"The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins.* Co., 494 F.2d 3, 14 (5th Cir. 1974).  "Without some finding of an independent substantive tort or other illegal conduct, liability cannot be premised on the tort of "unfair competition."  *RTLC AG Products, Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App.—Dallas 2006, no pet.).

NWTM asserts that the independent tort that supports its unfair competition claim is false advertising.  However, NWTM did not assert such a claim in its Amended Answer or Counterclaims—only in its Response to Provident's Motion for Summary Judgment.  *See* Dkt. No. 19 ¶¶ 42-44; Dkt. No. 74 at 41.  Moreover, NWTM did not supplement its discovery responses to identify a false advertising claim.  *See* Pl. Ex. D, Pl. App. 185-86 (Interrogatory Resp. Nos. 16-17).  Rather, when asked to state the basis for its state law claims, NWTM stated that "[e]very sale of product bearing the confusingly similar trademark or promoted with confusingly similar marketing material in Texas violates Texas law and associated regulations." *Id.*  It said nothing about a false advertising claim regarding the mint.  Finally, at the September

36

11, 2014 hearing on NWTM's Motion for Leave to File Second Amended Answer, NWTM stated that its state claims were merely derivative of its federal law claims—"[t]he claims under unfair competition are for trademark and trade dress, and they basically are the same as you have under the Lanham Act."  Dkt. No. 71 at 27 (Sept. 11, 2014 Hr'g Tr. at 27:18-20).  All of this is a sufficient basis for the Court to disallow NWTM's new theory of unfair competition.  *See S.E.C. v. Tambone*, 597 F.3d 436, 450 (1st Cir. 2010) ("A party cannot switch horses mid-stream, changing its theory of liability at a later stage of the litigation in hopes of securing a swifter steed."); *Brito v. Zia Co.*, 478 F.2d 1200, 1205 (10th Cir. 1973) ("It is within the discretion of the trial court to allow the parties to switch theories.").

### 2.  Unjust Enrichment

NWTM also brings a claim for unjust enrichment, should the Court find its trademark, trade dress, and copyright counterclaims unavailing.  *See Walker v. Cotter Properties, Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) ("Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay.").  However in light of the Court's findings regarding NWTM's trademark, trade dress, and copyright claims, NWTM cannot prove a claim for unjust enrichment, as NWTM conceded at the June 23, 2015 hearing.  *See Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992) ("Unjust enrichment is not a proper remedy merely because it "might appear expedient or generally fair that some recompense be afforded for an unfortunate loss" to the claimant, or because the benefits to the person sought to be charged amount to a windfall.").  Accordingly, the Court **GRANTS** summary judgment on behalf of Provident as to NWTM's state law claims.

## CONCLUSION

For the above reasons, Plaintiff's Motion for Summary Judgment is **GRANTED**.  The Court will enter a separate judgment.

**SO ORDERED**.

July 27, 2015.

**BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS**